# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **BONNIE LEFLOOR,** | ) |
| PLAINTIFF, | ) Case No: _____ |
| vs. | ) |
| | ) **JURY DEMAND** |
| **ERLANGER HEALTH SYSTEM** | ) |
| DEFENDANT. | ) |

# COMPLAINT

Plaintiff Bonnie LeFloor ("Plaintiff" or "Ms. LeFloor"), by and through counsel of record, files his *Complaint* against Erlanger Health System ("defendant" or "Erlanger"), and alleges as follows:

## I. INTRODUCTION

1. This is a civil action to make whole the Plaintiff for denial and interference with the exercise of rights guaranteed by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADAAA"), including the right to be reasonably accommodated without interference or retaliation, retaliation for opposition to unlawful actions, and be free from discrimination against him on account of Plaintiff's specific disabilities; said action also brings suit under the Tennessee Disability Act ("TDA"), TCA § 8-50-103 et seq., including the right to be protected from retaliation for opposition to unlawful actions, and be free from discrimination against him on account of Plaintiff's specific disabilities; and finally, said action also brings suit regarding Defendant's violations of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et. seq. ("FMLA"), which prohibits interference with the exercise of rights guaranteed by that statute,

1

as well as the denial and retaliation for the exercise of such rights.

## II. PARTIES

2. Plaintiff at all times relevant to this *Complaint,* resided in Flintstone, GA.

3. Defendant Erlanger Heatlh System (other DBA names: Erlanger Health, Erlanger Medical Center, Erlanger Health Specialty Pharmacy) is a commercial entity incorporated in the State of Tennessee, with its principal corporate address at 975 East 3rd Street Chattanooga, TN 37403-2173. At the time of the events subject of this Complaint herein, Defendant regularly did business in the Hamilton County, Tennessee area and employed more than 50 persons in the said area at the time of the facts that form the basis of this Complaint.

4. Valid service of process may be obtained on Defendant Erlanger Health System, via its registered agent: National Registered Agents, Incorporated, 300 Montvue Rd, Knoxville TN 37919-5546.

5. Plaintiff is a qualified individual with a disability.

6. Plaintiff was approved for FMLA leave by defendant prior to her termination.

## III. JURISDICTION AND VENUE

7. Plaintiff brings this action under 28 U.S.C. § 1331, alleging the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and employment law protections.

8. Venue is proper in the United States District Court for the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful employment practices occurred within Hamilton County, Tennessee, where Plaintiff formerly worked, where Plaintiff suffered the unlawful employment practices and resultant damages, and where Plaintiff would have continued to be employed by Defendant in the absence of its unlawful employment

2

practices.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and did so within 300 days of the actions of which she complained. Plaintiff filed her Charges for violations of the ADAAA on May 30, 2024 (Charge No. 494-2024-03031). On June 4, 2024, Plaintiff received her *Right to Sue Notices* from the EEOC for the aforementioned charges and therefore concluded the process of exhaustion requirements with the EEOC. Accordingly, this lawsuit and supporting ADAAA claims are properly and timely filed within ninety (90) days of issuance by the EEOC of Plaintiff's Notices of Right to Sue Letter on June 4, 2024. **(Exhibit 1, "Notice of Right to Sue").**

## V. STATEMENT OF FACTS

8. Plaintiff Bonni LeFloor began working as a labor and delivery nurse in 1991.

9. In her 32 years of nursing prior to working at Erlanger, Ms. LeFloor had never received any disciplinary action or been in any legal dispute with her former employers.

10. Ms. LeFloor started as a labor and delivery nurse with Erlanger Health System on June 13th, 2022.

11. Ms. LeFloor was terminated by Erlanger on February 16th, 2024.

12. Ms. LeFloor has a neuromuscular disorder which started in January 2023.

13. From January 2023 until November 2023, Plaintiff's manager Kaycee Eiseman provided minor accommodations that allowed her to continue working.

14. On August 21, 2023, Ms. LeFloor sent a lengthy email to Tammy Cotter, the Director of Human Resources at Erlanger, detailing her ongoing struggles utilizing Erlanger's benefits programs to find treatment for her developing disability. **Exhibit 2. August 21, 2023 email.**

3

15. In that August 21, 2023 email, Ms. LeFloor noted what she thought was her MS at that time (she later learned it was not MS) had progressed to the point where she could not walk more than 100 feet without her heart rate raising to 150 beats per minute or more. **Exhibit 2.**

16. At the end of the mail, Ms. LeFloor asked Ms. Cotter if she could assist Plaintiff by letting her know if there was any further documentation she needed to provide from her doctor, and by allowing her to work in the NICU or on light duty until she could get further treatment and understanding of her newly developing disability**. Exhibit 2**.

17. Ms. Cotter never responded to Ms. LeFloor's email from August 21, 2023.

18. Nonetheless, Ms. Lefloor's primary supervisor, Kaycee Eiseman, arranged for the accommodations Ms. LeFloor sought which would enable her to continue to do her job: primarily, working in labor and delivery with 1 to 2 patients located close to Ms. LeFloor's desk.

19. In September of 2023, Plaintiff applied for approval of intermittent FMLA leave through Unum, Erlanger's FMLA provider, and was denied because her doctor did not send the documentation in time.

20. Plaintiff applied for intermittent FMLA leave again in early October of 2023.

21. On October 16, 2023, Ms. LeFloor received tentative intermittent FMLA approval from Unum, Erlanger's FMLA provider, for her neuromuscular disorder.

22. Roughly one to two weeks later, Ms. LeFloor received confirmation from her manager, Kaycee Eiseman, that Ms. LeFloor's FMLA request had been approved.

23. In Ms. LeFloor's FMLA paperwork, her doctor wrote that Ms. LeFloor had a "history of hypertension, history of CVA (cerebrovascular accident (stroke)), severe chronic low back pain with sciatica, dystonia, parasthesias (skin tingling/numbness), and that she should have "limited hours on her feet" and "limited to lifting 15lbs." **Exhibit 3. FMLA paperwork.**

4

24. On or about November 29th, 2023, Tammy Cotter, the Director of the Human Resources department at Erlanger, called Ms. LeFloor to speak to her for the first time about Ms. LeFloor's developing disability and various requests surrounding her disability.

25. In that conversation, Ms. Cotter said Ms. LeFloor's supervisors should have never provided the accommodations that had been provided to Ms. LeFloor.

26. Ms. Cotter also said that Erlanger does not have to accommodate disabilities not related to work injuries.

27. Ms. Cotter also said she would have to speak to the legal team to figure out what to do with Plaintiff.

28. Ms. Cotter also said in a very disrespectful tone "What CAN you do, Bonnie?" When Ms. LeFloor began to cry in response to this question, Ms. Cotter strongly stated "Is there a problem!?".

29. From Plaintiff's recollection, Erlanger's workplace policy states "Erlanger cannot have a blanket policy preventing associates from returning to work with restrictions. It is against the law."

30. On December 1st, 2023, Ms. LeFloor was directed to stay seated for the entirety of her twelve and a half hour shift.

31. Ms. LeFloor texted her shift supervisor to say remaining seated for such an extended amount of time was unsafe given her recent stroke and her hypertension. However, Ms. LeFloor was not allowed to leave her seated post.

32. Following her shift on December 1st, 2023, Ms. LeFloor emailed her manager Kaycee Eiseman to get her thoughts on a potential email to Ms. Cotter in which Ms. LeFloor would share she spoke to her doctor, who said "if I wanted her to sit, I would have written that she sit and do nothing else." **Exhibit 4. December 1, 2023 email**.

5

33. Ms. LeFloor received no response from Ms. Eiseman regarding the December 1st email.

34. Upon information and belief, Ms. Eiseman shared a copy of the December 1st email with Ms. Cotter.

35. On December 3rd, 2023, Ms. LeFloor was again forced to sit for the entirety of her shift. She again texted the shift supervisor requesting to be relieved so she could get up and move, but no relief was provided.

36. Ms. LeFloor also asked if she could assist in any of the labor and delivery rooms near the desk because December 3rd is Ms. LeFloor's birthday, and her favorite part of her job has always been delivering babies who will share her birthday.

37. The standard patient to nurse ratio in the labor and delivery department is one or two patients to one nurse. Further, it is not difficult for nurses to be assigned to rooms in close proximity to the main desk. It would not have been difficult for Ms. LeFloor's supervisors to accommodate her requests.

38. Because Ms. LeFloor was denied any relief or permission to offer any assistance in nearby labor and delivery rooms, she texted her shift supervisor to share that being totally restricted to the desk, particularly on her birthday, made her feel really sad and depressed.

39. In that message, Ms. LeFloor specifically clarified she was not at all feeling suicidal, but simply wanted to express how sad she was that a small adjustment to her schedule, like assisting with one or two mothers near the desk, could not be provided.

40. Ms. LeFloor had extensive experience managing depression, as she had successfully managed struggles with depression with medication since she was fourteen years old.

41. Two days later, on December 5th, 2023, Ms. Cotter called Ms. LeFloor.

6

42. Ms. Cotter told Ms. LeFloor she believed she was suicidal, and that she would be put on mandatory leave until a psychiatric evaluation and a drug screening was completed. **Exhibit 5. Mandatory leave paperwork.**

43. Ms. Cotter also told Ms. LeFloor that someone from a third party company would call Ms. LeFloor that day to set up the evaluation.

44. Ms. LeFloor did not receive a call that day. She then waited to receive a call for almost two weeks. She never received a call.

45. Approximately two weeks after her December 5th conversation with Ms. Cotter, Ms. LeFloor reached out to Ms. Eiseman to ask how to get in touch with someone to complete the evaluation.

46. Ms. Eiseman found out from Ms. Cotter that Ms.LeFloor needed to call the provider. Ms. Eiseman then gave Ms. LeFloor the phone number to call for the evaluation.

47. After receiving the number, Ms. LeFloor called. The person then scheduled Ms.LeFloor for an appointment with an EAP approved therapist. Ms. LeFloor took the earliest available appointment, which was not until mid-January of 2024.

48. Ms. LeFloor also went ahead and scheduled an appointment with her primary care provider to complete the drug screening around the same time as the psychological evaluation.

49. On January 2, 2024, Ms. LeFloor sent an email to Ms. Cotter and Ms. Eiseman requesting consideration for RN, Program Manager- Women's and Infant Services, a position for which Ms. LeFloor would be extremely qualified, and a position that would accommodate her disability. She never received a response to this email. **Exhibit 6. January 2, 2024 email**.

50. On January 11, 2024, Ms. LeFloor completed her psychological evaluation with provider Xavier McCaskey, Phd. Dr. McCaskey concluded there was nothing wrong with Ms. LeFloor.

51. Dr. McCaskey expressed concern over how Erlanger was treating Ms. LeFloor. He told Ms. LeFloor, "what do you mean they don't think they can accommodate something that is not a workplace injury?" and "Why are they harassing you like this?".

52. Dr. McCaskey was delayed in submitting his paperwork after contracting pneumonia. On or about January 20, 2024, he submitted his paperwork clearing Ms. LeFloor of any psychiatric concerns.

53. On January 17, 2024, Ms. LeFloor completed a drug screen. She did not test positive for anything for which she did not have a prescription. **Exhibit 7. Drug screen paperwork**.

54. Also on January 17, 2024, Ms. LeFloor submitted a new FMLA approval request through Unum, in which she requested an extension of intermittent FMLA leave until July 17, 2024. **Exhibit 8. January FMLA application**.

55. On January 22, 2024, Ms. LeFloor was written up for messages she sent in a private group message with other Erlanger employees in response to another employee's request for financial assistance. Ms. LeFloor was told her messages were in violation of the professional conduct policy. **Exhibit 9: Text Messages and Write Up.**

56. Later in January of 2024, Ms. LeFloor learned her extended FMLA request was denied, not because of the substance of the request, but because, unknown to Ms. LeFloor, Erlanger had switched short term disability providers from away from Unum.

57. Upon information and belief, Erlanger switched away from Unum because Erlanger was under the belief that they should only provide accommodations for workplace related injuries, and they realized Unum did not agree with Erlanger on that issue.

58. Plaintiff's FMLA leave expired on February 5th, 2024.

59. On February 10th, 2024, Ms. LeFloor was given four "couplets" of patients (mother and baby) on four different halls in the hospital.

60. As mentioned previously, the typical nurse to patient ratio for the labor and delivery unit, Ms. LeFloor's primary area of practice, is 1:1 or 1:2. Further, it is not difficult to have those one or two patients be in rooms in close proximity to the desk.

61. Due to being given multiple patients in varied areas of the hospital, Plaintiff had to do an extensive amount of walking throughout her shift that day.

62. Due to all of the walking, Ms. LeFloor took her gabapentin to try and avoid a severe flair up of her neuromuscular symptoms. Even with her medication, she was unable to ward off the symptoms by the end of her shift.

63. After her shift, Ms. LeFloor was in the middle of an extreme flair up of her symptoms. The next morning, on February 11th, she woke up in horrendous pain she could not sufficiently treat with her prescriptions. Her legs felt like noodles, and her knees would buckle when she tried to stand up. She could barely walk around with her cane. Consequently, she had to call out of work for her shift scheduled that night.

64. Ms. LeFloor was next scheduled to work on February 15th. On that day, just before her shift began, she received a text from the shift supervisor saying there was no spot for her to work that night.

65. On February 16th at 8:00am, Plaintiff received a call from Ms. Eiseman informing her she had been terminated for calling out on February 11th. Ms. Eiseman further stated Ms. LeFloor had been terminated because calling out on February 11th was a violation of her probation she had been put on after being written up for allegedly violating the conduct policy for her personal texts sent to a coworker requesting financial assistance.

66. Plaintiff told Ms. Eiseman she had never been informed that she was ever on probation for the alleged conduct policy violation.

9

67. Plaintiff was told by a supervisor at Erlanger that standard procedure is for someone to receive three write-ups before they can be considered for termination.

68. While looking for a new job, Plaintiff learned that her former supervisor, Cherie Enevoldsen, who had told Plaintiff she would give her a good review, gave Plaintiff a negative review, which prevented Plaintiff from gaining new employment in at least one instance.

## VI. CAUSES OF ACTION

### Count 1

### Violation of ADA/ADAAA – Disability Discrimination

69. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

70. Pursuant to the ADAAA, an individual is considered to have a disability if she has a physical impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such impairment.

71. Plaintiff has a disability that substantially limits her in one or more major life activities, including walking, lifting, working and caring for herself.

72. Plaintiff could perform the essential functions of her job. Plaintiff made a request for reasonable accommodation, including, but not limited to, assisting the typical number of patients for a nurse in the labor and delivery department, and assisting patients in close proximity to her desk. Plaintiff also requested consideration for a position for which she was extremely qualified, RN, Program Manager- Women's and Infant Services, which would accommodate her disability.

73. Plaintiff was discriminated against and eventually terminated because of her disability and/or being regarded as disabled and/or request for a reasonable accommodation.

10

Case 1:24-cv-00204-CLC-CHS   Document 1   Filed 06/21/24   Page 10 of 14   PageID #: 10

74. Plaintiff asserts that the reasons given by defendant for her termination, including but not limited to violating her probation, were pretextual excuses for defendant's discriminatory basis for Plaintiff's termination.

75. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

76. As a result, Plaintiff is entitled to recover her damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which she may be entitled.

**Count II**

**Violation of ADAAA- Retaliation**

77. Plaintiff restates and incorporates herein the foregoing paragraphs.

78. It is federal public policy and law under the Americans with Disabilities Act that employees must be able to exercise their rights without fear of reprisal or penalty from an employer.

79. Plaintiff engaged in protected activity under the ADA when she requested an accommodation of serving a typical number of patients in close proximity to her work space, and taking time off after the aggravation of her disability because of defendant's disregard of her disability on February 10th, 2024. Such actions by the Plaintiff are statutorily protected activities under ADAAA.

80. Defendant retaliated against Plaintiff for exercising her rights under the ADAAA, i.e., requesting accommodations, and taking time off due to the aggravation of her disability on February 10th, 2024.

81. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

## Count III

### Violation of TDA- Disability Discrimination

82. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

83. Plaintiff was disabled as defined by the TDA.

84. Plaintiff was a qualified individual with a disability and/or regarded as disabled.

85. Defendant discriminated against Plaintiff on the basis of her disability in violation of the TDA that culminated in her being for calling out of work for the exacerbation of the symptoms of her disability because of Defendant's disregard for her accommodations requests.

86. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

87. As a result, Plaintiff is entitled to recover her damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which she may be entitled.

## Count IV

### Violation of FMLA

88. Plaintiff restates and incorporates herein the foregoing paragraphs.

89. Defendant retaliated against Plaintiff for requesting FMLA protected leave.

90. Defendant interfered with Plaintiff's FMLA rights.

91. Defendant is a covered employer within the meaning of the FMLA because it is engaged in commerce, and continuously employed fifty or more employees during **2023**.

92. Defendant is a covered employer within the meaning of the FMLA because it is engaged in commerce, and continuously employed fifty or more employees during **2022**.

93. Plaintiff had worked for Defendant at least 1,250 hours within the year preceding her lawful requests for FMLA leave in October 2023.

94. Defendant employed fifty or more employees within 75 square miles of Plaintiff's worksite.

95. Plaintiff was not a "key employee" for Defendant under the FMLA.

96. Plaintiff was entitled to receive FMLA leave to care for her own serious health condition.

97. Defendant subjected Plaintiff to disparate terms and conditions of employment after she requested and took FMLA, including but not limited to retaliating against her after she requested and took FMLA leave by refusing to abide by the medical limitations guidelines given by Plaintiff's doctor in the FMLA paperwork.

98. Defendant's actions constitute interference and/or retaliation violations of the FMLA.

99. Defendant's conduct was a motivating factor in adverse employment actions against Plaintiff.

100. Defendant's conduct harmed and caused damage to Plaintiff.

101. As a result, Plaintiff is entitled to recover damages, including lost wages and benefits, liquidated damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

## RELIEF REQUESTED

Plaintiff respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits, insurance and actual damages;

3. Reinstatement and/or front pay;

4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;

5. Liquidated damages;

6. Punitive damages;

7. Attorneys' fees and expenses;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further legal or equitable relief to which he may be entitled under the ADAAA, the TDA, FMLA and any other statutory or common law.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

**Respectfully submitted,**

s/ Adam Rodrigues
Adam Rodrigues, BPR#040141
Adam Rodrigues Law PLLC
4183 Franklin Rd. Ste B1 Box 209
Murfreesboro, TN 37128
Tel: 615-270-2074
Fax: 615-709-5770
adam@adamrodrigueslaw.com